Filed 3/27/14  P. v. King CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JASON KING,<br><br>        Defendant and Appellant. | A134044<br><br>(Alameda County<br>Super. Ct. No. 157947) |

Jason King appeals from a judgment upon a jury verdict finding him guilty of first degree murder (Pen. Code,[1] § 187, subd. (a)) and attempted murder (§§ 187/664).  The jury also found true the allegations that defendant used a firearm and intentionally discharged it within the meaning of sections 12022.5, subdivision (a); 12022.53, subdivisions (b), (c), and (d) and 12022.7, subdivision (a).  Defendant contends that the trial court abused its discretion in admitting evidence of a witness who claimed he was almost kidnapped two days prior to his testimony.  We affirm.

## I.  FACTS

Sherman "June" Hart testified that he knew defendant and Evan Williams from around the neighborhood.  Defendant and Williams were always together.

On June 10, 2007, Hart ran into defendant and Williams at Alice's house on 72nd Street in Oakland.  Williams took Hart's two dollars that were on a dresser and started to

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

leave.  Hart followed them out the door and said, "Hold on man.  What you doing?"  Williams turned around and knocked Hart into the bush.

Approximately 20 minutes later, Hart saw Jason McGill at the corner of 71st and Hamilton.  McGill was selling drugs and had sacks of marijuana in his hand and rock cocaine in his mouth.  Hart was on his bicycle and spoke to McGill for about 15 to 20 minutes.  At some point, he noticed a blue four-door Buick traveling south from International coming down 71st Street.  He then saw Williams and defendant approach.  Williams asked Hart, "June, nigga, what you got your bitch ass nigga ass here for?"

Williams and defendant were leaning against a wall about three feet away from Hart and McGill.  Hart saw Williams hand a black pistol to defendant.  Defendant stepped behind McGill and fired the gun at his head.  Hart then fled on his bicycle.  As he was cycling toward 69th Street, a number of gunshots were directed at him that ricocheted off the bicycle.  He heard about five gunshots.  He looked back and saw that defendant was shooting the gun.  Hart did not immediately notice that he had been hit in the lower calf area of his leg.  He proceeded to try to get out of the area.  When he reached International Boulevard, he realized that he had been hit in the leg.  A friend saw him and flagged down a police car.  Hart was taken by ambulance to the hospital where he was treated.  In addition to the gunshot wound to his leg, a bullet had also grazed his buttock.  McGill died from the gunshot wound to his head.

Sergeant Andreotti investigated the shooting.  He took a statement from Hart at the hospital at about 3:00 a.m. on June 11, 2007.  Hart provided a description of the suspects in the shooting.  Andreotti's investigation led to the identification of defendant and Williams as suspects.  Two days after the shooting, Hart identified defendant and Williams in a photographic lineup.

The police recovered a gun when they arrested Jerrin Carpenter in Oakland on June 11, 2007 for possession of a firearm.  Carpenter had purchased the weapon earlier that evening in a dice game.  The police subsequently determined that it was the murder

2

weapon.[2]  On September 6, 2007, the police arrested defendant and Williams after stopping them in a gray Buick.  Williams provided a statement to the police.

After defendant's arrest, he was incarcerated in the Santa Rita jail and housed in the cell next to Raul Villanueva.  Villanueva helped defendant with reading and writing and in preparing defendant's prisoner complaints.  Villanueva testified that defendant told him that he was in jail because he was charged with murder.  Defendant told him that he was involved in a shooting where the victim was shot in the back of the head.  The victim was shot because he was selling drugs on "his block" and refused to leave.  Defendant told Villanueva that his brother had been killed on that block and that he had no problems with taking people out on that block.

Defendant offered Villanueva a car and $7,000 to take care of a witness in his case.  Villanueva did not follow through with defendant's plan; he was interested only in purchasing the car.

Villanueva testified that his life was ruined as a result of having to testify in this case. He had received threats and, two days prior to his testimony, some people tried to throw him in a van and told him to "[k]eep your mouth shut."

Williams testified at the preliminary examination.   He refused to testify at trial; his preliminary hearing testimony was read to the jury.[3]  The court found that Williams was unavailable as a witness under Evidence Code section 240, subdivision (6) and permitted the People to introduce his testimony from the preliminary examination.

Williams testified that he had known defendant for probably 14 years.  On the evening of June 10, 2007, he was with defendant and they were selling cocaine and marijuana in the neighborhood of 71st Street in Oakland.  He said that he had gotten into a squabble with Hart earlier at Alice's house.  He later went to the liquor store with defendant and walked back toward 71st and Hamilton where he saw Hart and McGill.

---

[2] The parties stipulated that Officer Borjesson would testify that the weapon recovered from Carpenter was the same weapon used in this case.

[3] Sergeant Andreotti had recommended that Williams be placed in the witness relocation program.

He thought that McGill was selling Hart drugs. He approached Hart and started to swear at him. He then heard a gunshot behind him and subsequently he heard multiple gunshots. He saw a gun in defendant's hand, and saw that McGill was on the ground. Williams fled up 71st Street. He saw defendant fire at Hart who was riding away on his bicycle. Defendant fired five to seven shots at Hart. Williams and defendant believed that McGill was involved in the killing of Rudy Junior, their friend, who was killed at almost the same spot as McGill.

The parties stipulated that defendant suffered several previous arrests for drug possession and sales in the vicinity of 71st and Hamilton. The parties further stipulated that defendant was convicted of misdemeanor possession of marijuana, sale of cocaine base and possession for sale of marijuana and that he had admitted two probation violations. The parties also stipulated that Villanueva had suffered numerous felony convictions.

## II. DISCUSSION

Defendant contends that the trial court erred in admitting evidence that Villanueva was almost kidnapped just days before the trial. Villanueva testified that he was "jumped," almost thrown in a van, and told to "keep his mouth shut."[4] He perceived the threat as a warning not to testify in this case. We conclude that the court did not abuse its discretion in admitting the evidence.

"Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his] credibility and is well within the discretion of the trial court. [Citations.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 869.) Evidence of a third party threat may also bear on the credibility of

---

[4] The record suggests that defendant had a head injury at the time of his testimony. The following colloquy occurred during his testimony: "[Mr. Wilson (deputy district attorney)]: [Have] there been any consequences to you as a result of being asked to testify in this case? [¶] [Mr. Villanueva]: Look at my head, okay? I don't know what the hell is going on . . . ."

4

a witness even if the threat is not directly linked to the defendant. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084.)

Here, defendant requested an Evidence Code section 402 hearing concerning Villanueva's testimony. The court declined to hold a hearing, recognizing that it had discretion to admit the evidence and that it could rely on the deputy district attorney's offer of proof.

The court did not abuse its discretion in admitting the evidence. The evidence that Villanueva was attacked just days before his testimony was relevant to his state of mind and to his credibility. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368.) "A witness who testifies despite fear of recrimination of *any* kind by *anyone* is more credible because of his or her personal stake in the testimony." (*Ibid.*) It is immaterial whether the source of the threat came from the defendant; the important fact is that the witness is testifying despite fear of recrimination. (*Id.* at p. 1369.) The jury is entitled to evaluate the witness's testimony with the knowledge that it was given under fear of retaliation. (*Ibid.*)

Relying on *People v. Cardenas* (1982) 31 Cal.3d 897, 904, defendant argues that the testimony was cumulative evidence of witness bias. In *Cardenas*, the defendant presented the testimony of five witnesses who were his neighborhood friends. (*Id.* at pp. 902–904.) The court held that the evidence that these witnesses were also gang members was cumulative because their testimony had already established that the witnesses were biased because of their close association with the defendant. (*Id.* at p. 904.)

The present case is distinguishable. Here, Villanueva's testimony was not cumulative of evidence showing that he was fearful of testifying. While the testimony of Sergeant Gus Galindo also showed that Villanueva was a reluctant witness in that he feared being labeled a snitch,[5] that evidence was not cumulative of the fact that he was

---

[5] Galindo testified that during the interview, Villanueva expressed concern that he could be labeled as an informant or snitch which could get him injured or killed.

threatened immediately prior to his testimony. The threat evidence was highly relevant to show Villanueva's state of mind and credibility.

Moreover, any potential for prejudice from the evidence was eliminated by the court's limiting instruction. (*People v. Mendoza*, *supra*, 52 Cal.4th at p. 1088.) During Villanueva's testimony, the court instructed the jury that his testimony about threats was being received for the limited purpose of assessing "the credibility of this witness and for your ability to assess the witness's state of mind."

Defendant also argues that Villanueva's testimony that he was a member of the Bammer Boys increased the potential for prejudice. We disagree. The evidence that defendant was connected to the Bammer Boys was relevant to show motive for the shooting because McGill was selling drugs on the corner claimed by defendant's gang. Defendant had previously been arrested on that same corner for drug possession and sales. On these facts, the evidence was highly relevant and properly admitted. No error appears.

### III. DISPOSITION

The judgment is affirmed.

_____
Rivera, J.

We concur:

_____
Reardon, Acting P.J.

_____
Humes, J.

6